183 Cal.App.4th 1405 (2010)
107 Cal. Rptr. 3d 923
In re ANDY G., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent,
v.
A.G., Defendant and Appellant.
No. B215772.
Court of Appeals of California, Second District, Division Eight.
Filed April 20, 2010.
*1407 Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.
Robert E. Kalunian, Acting County Counsel, James M. Owens, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

OPINION
LICHTMAN, J.[*]

SUMMARY
The father in this juvenile dependency proceeding seeks reversal of the juvenile court's orders adjudging his two-year-old son Andy G. a dependent child of the juvenile court, refusing to release Andy to his father, and ordering the father to attend sexual abuse counseling for perpetrators. The court found that the father had sexually abused Andy's 12- and 14-year-old half sisters and that Andy was at substantial risk of sexual abuse as well. The father contends the evidence was insufficient to support the court's jurisdictional findings as to Andy and that the court should have released his son to the father's custody. We disagree and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND
Andy and his four half siblings were detained in January 2009. At the time, the family was being supervised by the Los Angeles County Department of Children and Family Services (the Department) under a voluntary family maintenance program to ensure adequate and appropriate parenting by the mother. Andy's father (who is not the father of the other four children) was not part of the program because the mother and children reported he did not live in the home and only had visits with his son Andy, but it was later discovered that he did live in the home. In early January, the Department received a child abuse report alleging that Andy's half sisters Maria and Janet were victims of sexual abuse by Andy's father (to whom we will refer *1408 as A.G. or Andy's father), who was arrested. The referral to the Department was generated after the girls told J.O. (their father) about A.G.'s conduct; J.O. confronted A.G. at the girls' home and then reported the matter to the police.
The Department's dependency petition alleged that A.G. sexually abused Janet and Maria by fondling Maria's breast, fondling Janet's vagina, exposing his penis, and exposing Maria to a pornographic movie and masturbating in her presence, and that the mother told the girls to recant their disclosure of the sexual abuse. The Department alleged that A.G.'s sexual abuse and the mother's actions endangered the physical and emotional health and safety of Janet and Maria and placed them and their three siblings "at risk of physical and emotional harm, damage, sexual abuse, danger and failure to protect." (Welf. & Inst. Code, § 300, subds. (b), (d) & (j).)[1]
The Department's detention report described the girls' reports of A.G.'s sexual abuse (more fully described in their testimony, post). Maria told her mother about A.G. exposing his penis to her, and thought her mother confronted A.G. because there was an argument, but A.G. remained in the home and continued to expose himself to Maria. Maria reported that her mother blamed her for A.G.'s arrest and was telling her and Janet to recant their statements so A.G. could be released and return home. The police report stated Maria told police that A.G. tried to have Maria reach into his front pocket for money a few weeks previously. On another recent occasion, when Maria walked into the kitchen late at night she found A.G. watching a pornographic video; he was rubbing his penis and "offered her to rub him." The police report indicated Maria said that, a few days after A.G. had fondled her breast as she was lying in bed, A.G. told her that "she better not tell anyone."
Janet and Maria reported that their mother was at home when the incidents of abuse occurred, but was elsewhere in the apartment and did not witness them. The family lived in a small single-studio apartment with a bathroom and kitchen, and all slept in a small space. The oldest half-brother, Javier (then 16), stated he did not know of anything happening to his sisters, but believed their statements, as they would not make something like this up. The youngest half sister, G.R. (then seven years old), did not report any incidents of inappropriate behavior by A.G., but indicated, without verbalizing why, that she was fearful of A.G. When the Department interviewed the mother, she said she thought the girls were lying and never liked A.G., and J.O. (their father) was trying to get A.G. out of the house in order to control her (the mother).
*1409 The Department's assessment was that the mother could not ensure the immediate safety of her daughters, as she doubted them, and admitted she had been told about A.G. before J.O. took the matter to the police and did not want to believe it was true. The Department concluded that G.R. and Andy "were at risk as well as it was unclear if the mother could ensure their safety," so all the children were taken into protective custody.
At the detention hearing, A.G. denied the allegations in the Department's petition and asked for Andy's release to him. The court detained all the children from the mother, and detained Andy from A.G., finding that "continuance in the home of the mother at this point and of [A.G.], I believe, is contrary to the children's welfare," and there were no reasonable means to protect the children "without removal at this time from the physical custody of the mother and [A.G.]." The juvenile court placed J.O.'s children (Javier, Maria and Janet) with J.O., and placed G.R. and Andy in foster care, with discretion to place them with any appropriate relative. (A few days later, Andy was placed with his adult half sister.) The Department was ordered to provide family reunification services, and visitation and other orders were made.
After various continuances, the hearing on jurisdiction and disposition began on April 27, 2009. At the hearing, Janet and Maria testified, as did J.O. and A.G.[2]
Maria testified that A.G. had touched her breast (on top of her shirt), and that A.G. had shown her his sexual parts (the first time when she was 11 years old) three or four times, two of which Maria described in some detail (and in one of which he asked her "if I want to play with it"). Janet testified that A.G. showed his private part and tried to touch her "down there" while she was in bed, "like right next to [her vagina]," but she moved so "he didn't do anything." Janet testified that A.G. had shown her his private part, "[h]is dick. It was when I was going to get my baby brother [Andy]," when A.G. asked her to take Andy to the store, "and when I was going to reach for him, [A.G.] lifted the pillow and that's when I saw his dick. So that we just went away, tried to ignore it." Janet then explained she was reaching for the money A.G. had in his hand to give to her when A.G. lifted up the pillow. At *1410 the time of this incident, "Baby Andy was in the sala [living room], like he was next to the T.V., in front of the T.V. because he was already to go to the store because thishe was in his little cart." Janet said Andy was in the room at the time, but "he was not facing the side where [A.G.] washe picked up the pillow." (When asked about the room where this incident occurred, Janet said: "You enter and you just enter the house where we sleep and then T.V. is there and the kitchen is separated and the restroom, too.")
A.G. and J.O. also testified. A.G. denied the allegations in the Department's petition and in the girls' testimony, and said that when J.O. confronted him at the home before reporting him to the police, their argument was about a broken camera and "he never mentioned . . . I was abusing the daughters or . . . anything." J.O.'s testimony was to the contrary.
The trial court sustained the Department's petition as amended (and described, ante), observing that "I found the girls to be credible in [that] they described things and the detail they turned to was very credible where they used as reference points when they told the stories." The court ordered reunification services and monitored contact for the mother and (with respect to Andy) for A.G.
A.G. asked that Andy be released to him, counsel stating that "with the court's true findings . . . the risk on this child would be minimal." The court found "by clear and convincing evidence substantial danger exists to the children's physical and mental health in the care of the mother [or A.G.] . . . . Substantial danger exists to their physical and or mental health." The court ordered A.G. to attend and complete Department-approved programs of parenting education, sex abuse for perpetrators and individual counseling to address case issues, and ordered monitored visitation with Andy at least twice weekly with the Department's discretion to liberalize. When the court enquired as to the extent of A.G.'s enrollment in programs, counsel reported that A.G. had not gone to any programs yet; the court found that he was not in compliance with the case plan.
A.G. filed a timely appeal from the court's orders.

DISCUSSION
Andy's father contends there was insufficient evidence to support the allegation that Andy was at risk of sexual abuse under section 300, subdivisions (d) and (j), that only the mother's conduct, not A.G.'s, placed *1411 Andy within the terms of section 300, subdivision (b), that even if the court's jurisdictional findings were supported by the evidence, the court's dispositional order (removing Andy from A.G.'s custody) was wrong in that the court should have "pursued other alternatives, such as family maintenance services" with the Department supervising Andy in A.G.'s home, and that the court should not have ordered A.G. to attend sexual abuse counseling for perpetrators. We disagree.
The crux of A.G.'s argument is that the evidence showing he sexually abused Andy's half sisters was not sufficient to show that Andy was at substantial risk of sexual abuse, since there was no evidence "of suspicious contact between [Andy's father] and his son Andy or between [Andy's father] and any juvenile or adult male." While there is some support in the cases for A.G.'s contention, we conclude there is sufficient evidence in this case to support the juvenile court's orders. We first describe the findings necessary to adjudge Andy a dependent, and then turn to the cases.
(1) As noted, the juvenile court found that Andy (as well as each of the other four half siblings) was a person described under subdivisions (b), (d) and (j) of section 300. These subdivisions provide that a child may be adjudged a dependent child of the juvenile court under the following conditions: (1) if there is a substantial risk that the child will suffer "serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child" (§ 300, subd. (b)); (2) if there is a substantial risk that the child "will be sexually abused . . . by his or her parent or guardian or a member of his or her household" (id., subd. (d)); and (3) if the child's sibling has been abused or neglected "and there is a substantial risk that the child will be abused or neglected, as defined in" other subdivisions (including subds. (b) & (d)) (id., subd. (j)).[3] Thus both subdivisions (d) and (j) of section 300 "require a finding of a substantial risk that the child who is the subject of dependency proceedings will be sexually abused by a parent or member of the child's household." (In re P.A. (2006) 144 Cal.App.4th 1339, 1347, fn. 6 [51 Cal.Rptr.3d 448].)
Three cases have considered the question whether a father's sexual abuse of a female child justified juvenile court jurisdiction over her male siblings.
*1412 First, in In re Rubisela E. (2000) 85 Cal.App.4th 177 [101 Cal.Rptr.2d 760] (Rubisela E.), the court concluded that the circumstances surrounding the abuse of Rubisela supported a finding under section 300, subdivision (j), as to her sister (because it was reasonable for the juvenile court to determine that in Rubisela's absence, the father's sexual offenses were likely to focus on his only other daughter (Rubisela E., at p. 197)), but not as to his sons (id. at p. 199). The court observed that sexual abuse of one sibling "can support a trial court's determination that there is substantial risk to the remaining siblings," citing, among other cases, In re Jason L. (1990) 222 Cal.App.3d 1206, 1215 [272 Cal.Rptr. 316] (rejecting father's contention evidence was insufficient to support removing son from his custody where court found father had molested his daughter). (Rubisela E., at p. 197.) But the court noted that, in Jason L., "the father's contact with the minor son was suspicious," because the father had one or two previous adult homosexual relationships, shared a bedroom with Jason, and showered with Jason while initially denying the joint showers occurred (Rubisela E., at p. 198, citing Jason L., at p. 1217), while in Rubisela E., there was "no evidence of this type of conduct . . ." (Rubisela E., at p. 198). The court continued: "We do not discount the real possibility that brothers of molested sisters can be molested [citation] or in other ways harmed by the fact of the molestation within the family. Brothers can be harmed by the knowledge that a parent has so abused the trust of their sister. They can even be harmed by the denial of the perpetrator, the spouse's acquiescence in the denial, or their parents' efforts to embrace them in a web of denial." (Rubisela E., supra, 85 Cal.App.4th at p. 198.) "We do not discount the real possibility that brothers of molested sisters can be molested [citation] or in other ways harmed by the fact of the molestation within the family. Brothers can be harmed by the knowledge that a parent has so abused the trust of their sister. They can even be harmed by the denial of the perpetrator, the spouse's acquiescence in the denial, or their parents' efforts to embrace them in a web of denial." (Rubisela E., supra, 85 Cal.App.4th at p. 198.) Quoting In re Kieshia E. (1993) 6 Cal.4th 68, 76-77 [23 Cal.Rptr.2d 775, 859 P.2d 1290], the court concluded: "`When a parent abuses his or her own child, or permits such abuse to occur in the household, the parent also abandons and contravenes the parental role. Such misparenting is among the specific compelling circumstances which may justify state intervention, including an interruption of parental custody. [Citation.]' But in the case at bench, while such a showing is possible, there has been no demonstration by the department that `there is a substantial risk [to the brothers] that [they] will be abused or neglected, as defined in . . . [the applicable] subdivisions' [citation]. We must therefore *1413 reverse the jurisdictional order as to the brothers . . . ."[4] (Rubisela E., supra, 85 Cal.App.4th at p. 199.)
(2) The second case is In re Karen R. (2001) 95 Cal.App.4th 84 [115 Cal.Rptr.2d 18] (Karen R.). There, the juvenile court found, among other things, that Karen had been sexually abused by her father, her mother failed to protect her, and her father's conduct placed her siblings, Alvaro and Jennifer, at risk of suffering similar sexual abuse. The mother appealed, contending there was no evidence that Alvaro was at substantial risk of sexual abuse (and therefore she should be relieved of the requirement that she address issues of sexual abuse of a male child during the family reunification period). (Id. at p. 89.) The Court of Appeal found the evidence demonstrated both that Alvaro personally was the victim of sexual abuse (because he witnessed both parents beating Karen and later saw Karen crying and reporting that the father had raped her) (id. at p. 90) and that Alvaro was at substantial risk of future sexual abuse (ibid.). As to the latter point, the court expressed disagreement with Rubisela E.: "Additionally, we conclude a father who has committed two incidents of forcible incestuous rape of his minor daughter reasonably can be said to be so sexually aberrant that both male and female siblings of the victim are at substantial risk of sexual abuse within the meaning of section 300, subdivision (d), if left in the home. To the extent other cases suggest only female siblings are in substantial danger of sexual abuse after a sexually abused female sibling has been removed from the home due to sexual abuse by a father, we respectfully disagree. [Citations.] Although the danger of sexual abuse of a female sibling in such a situation may be greater than the danger of sexual abuse of a male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial. Given the facts of this case, the juvenile court reasonably could conclude every minor in the home, regardless of gender, was in substantial danger of sexual abuse by father." (Karen R., supra, 95 Cal.App.4th at pp. 90-91, italics added.)
Finally, the court in In re P.A., supra, 144 Cal.App.4th 1339 rejected a father's claims that the evidence was insufficient to support allegations that he had sexually abused P.A., his nine-year-old daughter, and that P.A.'s two male siblings, who were eight and five years old, were at risk of harm. After concluding substantial evidence supported the juvenile court's finding that on one occasion, father sexually abused P.A. "`consisting of but not limited to . . . touching . . . [P.A.'s] vagina under her clothes on top of her *1414 underwear,'" and that "[s]uch abuse by the father places the children at risk" (id. at p. 1343), the court turned to the father's contention there was insufficient evidence that P.A.'s male siblings were at risk of harm. The father argued that neither boy ever asserted his father had touched him inappropriately; there was no evidence he sexually abused his sons; both of the boys said they were unaware of any abuse of P.A.; father was participating in sexual abuse counseling and parent education classes that would minimize any potential risk of harm to his sons; there was no evidence father had ever engaged in homosexual conduct; and (citing Rubisela E.) sexual abuse of one minor does not necessarily create a substantial risk that the minor's siblings would be sexually abused. (In re P.A., supra, 144 Cal.App.4th at p. 1345.)
The Court of Appeal disagreed with the father. After describing Rubisela E. and Karen R., the court "reach[ed] the same conclusion" as Karen R. (In re P.A., supra, 144 Cal.App.4th at p. 1347.) The court stated: "The abuse in this case concededly is less shocking than the abuse in Karen R. However, this does not mean that Rubisela E. therefore applies. Rather, we are convinced that where, as here, a child has been sexually abused, any younger sibling who is approaching the age at which the child was abused, may be found to be at risk of sexual abuse. As we intimated in Karen R., aberrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior." (In re P.A., supra, 144 Cal.App.4th at p. 1347, italics added.)
(3) Turning to this case, we agree with the proposition advanced in In re P.A. that "aberrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior." (In re P.A., supra, 144 Cal.App.4th at p. 1347.) Here, the only significant difference from In re P.A. is the fact that Andy was only two and one-half years old at the time of the court's orders, so he was not "approaching the age at which [his sisters were] abused . . . ." (Ibid.) (Maria said she was about 11 years old the first time A.G. exposed his penis to her.) But other factors convince us that the evidence was sufficient to support the court's findings that Andy was at substantial risk of sexual abuse. While Andy may have been too young to be cognizant of A.G.'s behavior, A.G. exposed himself to Janet while Andy was in the same room (albeit apparently facing in the other direction). Indeed, the court could infer, as the Department suggests, that A.G. used Andy to get Janet to approach him so he could expose himself to her, by asking her to take Andy to the store and holding out the money to do so. This evinces, at best, a total lack of concern for whether Andy might observe his aberrant sexual behavior. (And, unlike the father in In re P.A., A.G. apparently believes he should not have to undergo sexual *1415 abuse counseling for perpetrators, as he argues on appeal that even if this court determines jurisdiction over Andy was proper, the case plan for him should not include such counseling.)
(4) In short, on this record the juvenile court properly could conclude that A.G.'s aberrant sexual behavior with Janet and Maria placed their brother Andy at risk of sexual abuse.[5] Accordingly, the trial court's jurisdiction findings under section 300, subdivisions (d) and (j) were proper.[6]
A.G. next contends that, even if the jurisdictional findings were proper, its dispositional orderfinding by clear and convincing evidence that a substantial danger existed to Andy's physical and mental health if left in the care of A.G. (see § 361, subd. (c)(1))was not supported by substantial evidence. But A.G.'s only argument in support of this contention is that the evidence "did not support a risk of abuse to Andy if he were released to his father." As we have seen, the contrary is so; the record contains sufficient evidence, as described ante, from which a reasonable trier of fact could find a substantial danger to Andy by clear and convincing evidence.[7] (See In re Mariah T. (2008) 159 Cal.App.4th 428, 441 [71 Cal.Rptr.3d 542].)

*1416 DISPOSITION
The orders are affirmed.
Bigelow, P.J., and Rubin, J., concurred.
NOTES
[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] According to the Department's jurisdiction/disposition report, A.G. stated he is employed and lives at his mother's home. He admitted he has a criminal history and had been in state prison for drug-related charges; he reported he had been under parole supervision and complied with his requirements.
[3] Section 300, subdivision (j), further states: "The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."
[4] The court found clear and convincing evidence supported the continued removal of the father from the family home and denial of custody of his children, observing that the younger daughter was still in the family home. (Rubisela E., supra, 85 Cal.App.4th at p. 199.)
[5] The court in In re P.A. also observed that its conclusion was consistent with section 355.1, subdivision (d). That section provides that "[w]here the court finds that . . . a parent . . . who resides with . . . a minor who is currently the subject of the petition filed under Section 300 . . . has been found in a prior dependency hearing . . . to have committed an act of sexual abuse, . . . that finding shall be prima facie evidence in any proceeding that the subject minor is a person described by subdivision (a), (b), (c), or (d) of Section 300 and is at substantial risk of abuse or neglect. The prima facie evidence constitutes a presumption affecting the burden of producing evidence." (§ 355.1, subd. (d).) In re P.A. observed that, while section 355.1 did not apply because there was no prior dependency hearing, "it nonetheless evinces a legislative determination that siblings of sexually abused children are at substantial risk of harm and are entitled to protection by the juvenile courts." (In re P.A., supra, 144 Cal.App.4th at p. 1347.)
[6] A.G. argues that his conduct did not place Andy within the purview of subdivision (b) of section 300, which provides that a child is within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child. . . ." (§ 300, subd. (b).) A.G. is arguably correct. (Cf. Rubisela E., supra, 85 Cal.App.4th at p. 196 [reversing subd. (b) finding as to the father, where Department conceded that the father's conduct did not place the children within that subdivision].) But the conclusion that the subdivision (b) finding does not apply as to A.G. profits him nothing because, "[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (In re Alexis E. (2009) 171 Cal.App.4th 438, 451 [90 Cal.Rptr.3d 44].)
[7] A.G.'s final claimthat even if jurisdiction over Andy was proper, "the case plan for [A.G.] must be revised" to omit sexual abuse counseling for perpetratorsis equally without merit.